**In re PRIZE FRIZE, INC., Debtor.**

**ENCINO BUSINESS MANAGEMENT, INC., Appellant,**

v.

**PRIZE FRIZE, INC. and U.S. Trustee, Appellees.**

**BAP No. CC–92–1328–PVO.**

**Bankruptcy No. LA91–67651–KM.**

United States Bankruptcy Appellate Panel, Ninth Circuit.

Argued and Submitted Nov. 18, 1992.

Decided Feb. 11, 1993.

---

Michael S. Goergen, Encino, CA, for Encino Business Management, Inc.

Steven L. Crane, Los Angeles, CA, for Prize Frize, Inc.

Before PERRIS, VOLINN and OLLASON, Bankruptcy Judges.

## OPINION

PERRIS, Bankruptcy Judge:

The bankruptcy court granted the debtor's motion to reject its license agreement with appellant Encino Business Management, Inc. ("Encino) and in its order stated Encino may retain its rights under 11 U.S.C. § 365(n)(1)(B)[1] if it pays presently due and future license fees and waives any rights of setoff with respect to the contract. Encino filed this timely appeal, objecting to the requirement that it pay past due and future license fees. We AFFIRM the bankruptcy court's order.

## FACTS

The debtor, Prize Frize, Inc.,[2] is the owner and licensor of all technology, patents, proprietary rights and related rights used in the manufacture and sale of a french fry vending machine. On March 6, 1991, the debtor entered into a License Agreement granting Encino's predecessor in interest[3] an exclusive license to utilize the proprietary rights and to manufacture, use and sell the vending machine.[4] In consideration for the license to use the proprietary information and related rights, Encino agreed to pay the debtor a $1,250,000 license fee, $300,000 to be paid within ten days of execution of the agreement with the balance due in $50,000 monthly payments. Encino also agreed to pay royalty

---

1. All section references are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, unless the context otherwise indicates.

2. The debtor and the debtor in possession will be collectively referred to as "the debtor."

3. Encino and its predecessor in interest will be collectively referred to as "Encino."

4. The agreement defined the proprietary rights to mean "all patents, patent applications, patented ideas, trade secrets, know-how and other proprietary valuable information relating to the design, manufacture or use of the vending machines. ..."

payments based on a percentage of franchise fees, of net marketing revenues and of any sales of the machines or certain related products. The license agreement also provided that if there is a failure of design and/or components of the machines to the extent that they are not fit for their intended use and are withdrawn from service, then Encino's obligations would be suspended for a period of 180 days, during which time the debtor was entitled to cure any defect.

The debtor filed its Chapter 11 petition on March 12, 1991. In September of 1991, Encino stopped making the $50,000 per month license fee payments and has made no payments since. Encino contends that there is a design defect in the machines which caused the machines to be withdrawn from service and which allowed the suspension of its payment obligation to the debtor.[5]

The debtor subsequently filed a motion to reject the license agreement with Encino and to compel Encino to elect whether it wished to retain its rights under section 365(n)(1) and make the payments required under section 365(n)(2). Encino did not file a written response to the motion. At the hearing, Encino's counsel indicated that he did not oppose rejection. He disputed, however, that Encino should be required to immediately pay $350,000 in past due license fee payments, contending that the obligation to make such payments was suspended because of the purported design defect.

The bankruptcy court entered an order indicating that the debtor may reject the agreement, that Encino may elect whether to retain its rights under the agreement pursuant to section 365(n)(1) and that if Encino elected to retain its rights under the agreement it must do the following: (1) make all license fee payments presently due in the amount of $350,000 within seven days of its election; (2) pay the $400,000 balance of the license fee in monthly installments of $50,000; and (3) waive any and all rights of setoff with respect to the contract and applicable non-bankruptcy law and any claim under section 503(b) arising from performance under the agreement. The court's order also stated that assuming, *arguendo*, that Encino's·payment obligations were properly suspended, the 180 day suspension period has ended and the September to March monthly payments are now due. Encino filed this timely appeal.

## ISSUES

The ultimate issue in this appeal is whether the bankruptcy court erred in requiring Encino to immediately pay $350,000 in past due license fee payments as a condition to its election to retain its rights under section 365(n). Resolution of this issue requires consideration of the following sub-issues:

1. Whether the license fee payments are royalty payments within the scope of section 365(n)(2).

2. Whether Encino is excused from making immediate payments under section 365(n)(2) by virtue of the suspension provisions of the license agreement.[6]

---

**5.** Based on the dispute regarding the design defect, Encino apparently filed an adversary proceeding against the debtor seeking declaratory relief as to its rights under the license agreement. *See* Complaint for Declaratory Relief, E.R. at 47–66. As will be discussed further below, Encino did not present any evidence to the bankruptcy court in support of its contention of a design defect. Similarly, although Encino included a copy of the complaint with an attached letter referring to a design defect in its Excerpts of Record, it did not introduce the complaint to the bankruptcy court in connection with the court's ruling on the motion to reject the license agreement. Rather, Encino raised its contentions regarding the design defect only in its oral argument to the court.

**6.** These two sub-issues encompass all of the arguments made by Encino in its brief. Encino's statement of issues in its brief stated two additional issues—whether the bankruptcy court erred in granting four separate licensees the right to elect to retain rights in the same intellectual property and that section 365(n) is unconstitutionally vague. Because, however, Encino's brief contains no argument pertaining to these issues, Encino has waived these issues. *See United State v. John Bernard Industries, Inc.,* 589 F.2d 1353, 1362, n. 5 (8th Cir.1979); *see In re Marquam Investment Corp.,* 942 F.2d 1462, 1467 (9th Cir.1991); *In re Hooper,* 112 B.R. 1009, 1011, n. 3 (9th Cir. BAP 1990).

## STANDARD OF REVIEW

The Panel reviews findings of fact for clear error and conclusions of law *de novo*. E.g., *In re McCoy*, 111 B.R. 276, 278 (9th Cir. BAP 1990). This appeal primarily concerns the interpretation of the pertinent statute and the contract of the parties—questions of law reviewed *de novo*. *See, e.g., In re Quintana*, 915 F.2d 513, 515 (9th Cir.1990); *In re Estreito*, 111 B.R. 294, 295 (9th Cir. BAP 1990).

## DISCUSSION

If the trustee or debtor in possession rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee may elect to retain its rights under the contract. Section 365(n)(1)(B).[7] If the licensee elects to retain its rights under the contract, the licensee must make all royalty payments due under the contract and will be deemed to have waived any right of setoff it may have with respect to such contract and any claim under section 503(b) arising from the performance of the contract. Section 365(n)(2)(B)–(C). In this case, Encino challenges the bankruptcy court's determination that past due license fee payments are royalty payments under section 365(n)(2) and contends that, in any event, the license fee payments are not currently due given the contract provision suspending its obligations if there is a design defect.

### 1. *The license fees as royalty payments.*[8]

The Bankruptcy Code does not contain a definition of the term "royalty payments." There is a paucity of authorities construing section 365(n) and none addressing the scope of this term. In non-bankruptcy contexts, while the term royalty is usually employed in a restricted sense to denote periodic payment based upon productivity for use of intangible property, authorities also define the term broadly to mean money or compensation paid for the use of intangible property. *See* 3 Peter D. Rosenberg, *Patent Law Fundamentals*, § 16.-02[1] (2d ed. 1992); 6 Ernest B. Lipscomb III, *Walker on Patents*, § 20.43 at 145 (3d ed. 1987); *see also Black's Law Dictionary* at 1195 (5th Ed.1979).

Although the statute provides no definition for the term "royalty payment" and nonbankruptcy authorities provide no clear definition of the term, the legislative history of section 365(n)(1) is instructive:

> It is important that courts, in construing the term "royalty" used in this subsection, and in deciding what payments are royalty payments, look to the substance of the transaction and not the

**7.** Section 365(n) provides, in pertinent part, as follows:

(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—

(A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

(B) to retain its rights ... under such contract and under any agreement supplementary to such contract, to such intellectual property ..., as such rights existed immediately before the case commenced, for—

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

(2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—

(A) the trustee shall allow the licensee to exercise such rights;

(B) the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and

(C) the licensee shall be deemed to waive—

(i) any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

(ii) any claim allowable under section 503(b) of this title arising from the performance of such contract.

    •     •     •     •     •

**8.** Although Encino did not raise this issue in the bankruptcy court, we nevertheless consider it on appeal because it is an issue of law involving the interpretation of the pertinent statute and the parties' contract based upon intrinsic evidence of intent. *See, e.g. Romain v. Shear*, 799 F.2d 1416, 1419 (9th Cir.1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 840 (1987).

label. The underlying nature of the payments must be considered. For example, payments based upon the use of intellectual property or on a percentage of sales of end products that incorporate or are derived from the intellectual property should be treated as royalty payments. H.R.Rept.No. 1012 at 9, 100th Cong., 2nd Sess. (1988).

■ Given this legislative history, we agree with the bankruptcy court that the term "royalty payments" must be defined broadly to include the license fees at issue. The legislative history reflects that this term encompasses any payment for use of intellectual property, no matter how that payment is named in the agreement. Under such a definition, the fact that the payments are called license fees or the fact that the payments are based upon a flat fee rather that a percentage of sales will not preclude their treatment of royalty payments for purposes of section 365(n)(2). If this were not the case, licensees would be allowed to continue to use property of the estate without compensating the estate simply because they labeled the payments license fees or structured the payment on a flat fee rather than a percentage basis.

■ In this case, the license agreement clearly reflects that the license fees are for the use of the intellectual property. Article 4.1 of the agreement states that the license fee is in consideration of the grant of the machine licenses. The grant of the machine license was the grant of the license to utilize the proprietary rights. That there may be additional payments due upon sales, merchandising or franchising that are specifically designated as royalty payments does not mean that the license fee is not payment for use of the debtor's intellectual property. Encino is arguably correct that the license fee should not be considered a royalty to the extent it is consideration for continuing affirmative obligations of performance on the part of the debtor, such as warranties and indemnification agreements.[9] The agreement, however, reflects that the license fee is in consideration for the use of the intellectual property, not for such continuing affirmative obligations of performance. We, therefore, determine that the bankruptcy court correctly determined that the license fee payments constitute royalty payments for purposes of section 365(n)(2)(B).

*2. The effect of the suspension provision.*

Encino argues that even if the license fee payments are considered royalty payments, the bankruptcy court erred in determining that $350,000 is presently due. Encino contends that this amount was not due upon its election to retain its rights because its payment obligation was suspended because of the design defect in the machine.

Encino's argument must fail as a matter of law because Encino submitted no evidence to the bankruptcy court of a design defect justifying suspension of its payment obligations under the contract. Although Encino raised this issue at oral argument in the bankruptcy court, it did not file a written objection or submit any evidence justifying its factual contention of a design defect.[10] Given this lack of evidence, there is no basis upon which the bankruptcy court could have determined that the suspension provision applied to relieve Encino, in any way, of its obligation to make the license fee payments.

■ Encino attempts to submit evidence of the design defect to the Panel in the form of a letter referring to a design defect that is attached to an adversary proceeding complaint. This letter, howev-

---

**9.** In discussing the licensee's obligation to continue making royalty payments, the House Report indicates that the licensee remains bound by the obligations or duties required under the contract "except for those so directly related to obligations or duties that the licensor has been freed from by rejection as to make it inequitable to bind the licensee to them." H.R. Rept No. 1012 at 7, 100th Cong., 2nd Sess. (1988).

**10.** This failure is a violation of local rules which would allow the bankruptcy court to deem Encino to have consented to the motion to reject. *See* Local Rules of the United States Bankruptcy Court for the Central District of California, Rules 111(1)(g) and 111(1)(j).

er, is merely a statement of Encino's contention of a design defect and provides no evidence of the existence of such a defect. In addition, the letter and complaint were not submitted to the bankruptcy court and was not part of the bankruptcy court's record in connection with this contested matter. Therefore, even if the complaint could be considered evidence on this issue, it cannot be considered as substantive evidence on appeal. *See In re McCoy*, 111 B.R. 276, 277, n. 1 (9th Cir. BAP 1990); *In re Blumer*, 95 B.R. 143, 147 (9th Cir. BAP 1988). Encino, therefore, has not established that its payment obligations were suspended under Article 7.3 of the license agreement. The bankruptcy court did not err in conditioning Encino's retention of its rights on the immediate payment of $350,-000.[11]

## CONCLUSION

The bankruptcy court correctly determined that the license fee payments were royalty payments for purposes of section 365(n)(2)(C). Encino failed to establish that any of its obligations to the debtor had been suspended. Accordingly, we AFFIRM the bankruptcy court's order.

---

**11.** Although this is not the reasoning relied upon by the bankruptcy court, we can affirm the bankruptcy court's order on any basis supported by the record. *See, e.g., In re Gulino*, 779 F.2d 546, 552 (9th Cir.1985).